CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

NOV 01 2005

JOHN F. CORCORAN, CLERK
BY: /s/ [signature]
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

RANDY LEE ROBINS,    )
    )
    Plaintiff,    )    Civil Action No. 1:04cv00126
    )
v.    )    **MEMORANDUM OPINION**
    )
JO ANNE B. BARNHART,    )    By:  GLEN M. WILLIAMS
**Commissioner of Social**    )    Senior United States District Judge
**Security,**    )
    )
    Defendant.

In this social security case, the court vacates the final decision of the Commissioner denying benefits and remands this case to the Commissioner for further development consistent with this opinion.

## I. Background and Standard of Review

Plaintiff, Randy Lee Robins, ("Robins"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Robins's claims for a period of disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 and Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) & 1383(c)(3) (West 2003 and Supp. 2005).

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

Robins filed previous applications for benefits on September 28, 2000, September 28, 2001, and October 7, 2002, all of which were denied initially and on reconsideration, and the Appeals Council affirmed all of the decisions. (R. at 17.) The most recent decision denying Robins's prior claims came on July 25, 2003. Therefore, the ALJ stated that he would consider the time period from July 25, 2003, forward because any claim for benefits before that date was barred by res judicata. (R. at 17.)

Robins filed his current applications for DIB and SSI payments on or about August 18, 2003, alleging disability as of October 1, 1999, based on depression, panic attacks and social phobias. (R. at 54-56, 64.) The claim was denied initially and on reconsideration. (R. at 41-43, 45-46. ) Robins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 48-49.) The ALJ held a hearing on March 16, 2004, at which Robins was not represented by counsel. (R. at 374-88.)

By decision dated March 26, 2004, the ALJ denied Robins's claims. (R. at 16-21.) The ALJ found that Robins met the disability insured status requirements of the Act and was insured for DIB purposes through the date of the decision. (R. At 20.) The ALJ concluded that Robins had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 20.) The ALJ found that Robins suffered from severe impairments, borderline intellect and alcohol abuse, but the ALJ found that his impairments did not meet or medically equal one of the listed impairments found at 20 C.F.R. Part 404, Subpart P. (R. at 20.) The ALJ believed that Robins's allegations regarding his limitations were not totally credible and that he retained the residual functional capacity to perform all work except those jobs requiring him to perform highly skilled and complex tasks and jobs that required interaction with the public. (R. at 20.) The ALJ found that Robins could not perform his past relevant work. (R. at 20.) Based on Robins's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy which Robins could perform. Therefore, the ALJ concluded that Robins was not under a "disability" as defined in the Act at any time through the date of the decision. (R. at 20.) *See* 20 C.F.R. §§ 404.1520(g) and 416.920(g) (2005).

After the ALJ issued his opinion, Robins pursued his administrative appeals, (R. at 12), but the Appeals Council denied his request for review. (R. at 7-9.) Robins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). This case is before the court on the Commissioner's motion for summary judgment, filed May 9, 2005, (Docket Item No. 15), and Robins's motion for summary judgment, (Docket Item No. 12), filed April 6, 2005.

## II. Facts

Robins was born in 1968, which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c) and 416.963(c). (R. at 54.) Robins has a ninth-grade education and past relevant work experience as a maintenance helper. (R. at 376-77.)

At his hearing on March 16, 2004, Robins testified that he last worked in 1999 as a maintenance helper at Dutton Wagner. (R. at 376.) Robins testified that his work as a maintenance helper required him to perform miscellaneous chores and that he occasionally had to lift boxes weighing up to 30 pounds. (R. at 376-77.) Robins testified that prior to working at Dutton Wagner, he was employed part-time by the Washington County School System as a maintenance helper. (R. At 377.) He stated that his employment with the Washington County Schools was primarily a summer job and that it involved painting, moving furniture and assisting the full-time maintenance crew. (R. at 377.) Robins testified that he performed no other relevant work during the last 15 years. (R. at 377-78.)

Robins testified that he was no longer able to work due to his emotional problems and depression. (R. at 378.) Robins stated that he had been hospitalized due to his mental condition between six or eight times since age 18. (R. at 378-79.) Robins further noted that he was admitted to the Bristol Regional Medical Center on January 30, 2004, based on complaints of anxiety, depression and suicidal ideations. (R. at 378.) Robins testified that while he had experienced suicidal thoughts in the past, he did not believe that he would ever go through with it. (R. at 378.) Robins testified that one of the big issues in his life had been his abuse of alcohol. (R. at 379.) Although Robins stated that he had stopped drinking, he admitted that he had experienced three relapses in the past year. (R. at 379.) He also stated that he had

-4-

been in detoxification before and went through treatment once a week to try to keep from having relapses. (R. at 379-80.) Finally, Robins testified that he had not been drinking prior to being admitted to the hospital in January 2004. (R. at 380.)

Robins then testified that he was currently taking Prozac for his depression, Inderal for his anxiety and Catapres and hydrochlorothiazide for his high blood pressure. (R. at 380-81.) Robins stated that his blood pressure had improved but was still a little higher than it should be. (R. at 381.) When asked whether he had any other problems that prevented him from working, Robins responded that he also had problems with his feet. (R. at 381.) Robins noted that his foot pain was "nothing real major," and that he had not been to the doctor in about five years. (R. at 381.) Robins stated that his ability to walk and stand was only affected if he stood or walked on concrete for long periods of time. (R. at 382.)

Robins testified that he was currently receiving counseling for his alcohol abuse, and he said that he also had received counseling for depression and anxiety at the Highlands Counseling Center in the past. (R. at 382.) Robins noted that counseling was no longer feasible, however, due to his current financial situation. (R. at 382.)

When asked about his daily activities, Robins testified that he watched television and occasionally went outside for a walk. (R. at 382-83.) Robins stated that he did not drive because his driver's licence had been suspended six or seven years ago and he had never gone to the DMV to have the license renewed. (R. at 382.) When asked about his memory, Robins stated that he could follow along with television programs fairly well, and he could remember appointments to go to

therapy, etc. (R. at 383.) He also said that he did not attend church, and the only household chore he did was clean his room once a week. (R. at 384.)

When asked why he was forced to quit work in 1999, Robins testified that it was because of stress and worries. (R. at 384.) He then stated that he had gained approximately 10 or 20 pounds since then because he was depressed and did not get enough exercise. (R. at 384.)

Robert Spangler, a vocational expert, also testified at Robins's hearing. (R. at 385-87.) Spangler classified Robins's work at the egg warehouse as medium[1] and unskilled and Robins's work as a maintenance helper for the school system as unskilled and requiring between medium and heavy[2] exertion.. (R. at 385.) Spangler testified that Robins had no transferable skills (R. at 385-86.) The ALJ then posed a hypothetical question to Spangler to elicit testimony about the number and types of jobs that Robins could perform. The ALJ asked Spangler to assume that the claimant was 35 years old with a ninth-grade education and the previously described work background, but with no exertional limitations in doing only simple, unskilled jobs that would not require regular interaction with the public. (R. at 386.) Spangler

---

[1]Medium work is work that involves lifting objects weighting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.927(c) (2005).

[2]Heavy work is work that involves lifting objects weighing no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, he also can do sedentary, light and medium work. *See* 20 C.F.R. §§ 404.1567(d), 416.927(d) (2005).

replied that there would be 1,492,000 jobs nationally and 19,200 jobs regionally[3] that such an individual could perform in the medium-simple category. (R. at 386.) Furthermore, Spangler testified that there were 1,403,000 jobs nationally and 18,250 jobs regionally that such an individual could perform in the light[4]-simple category. (R. at 386.) Spangler then stated that examples of the jobs that such individual could perform included a truck driver helper (medium exertion), janitor (medium and light), houseman, which is like a male maid, (medium and light), farm worker (medium and light), forestry worker (medium), logger (medium and heavy), non-construction laborer (medium and light) and vehicle washer (medium and light). (R. at 386-87.) Then Spangler stated that if the individual's ability to concentrate and persist at work tasks were greater than moderately impaired, he could not perform any of the jobs previously stated. (R. at 387.)

In rendering his decision, the ALJ reviewed records from Barry Friedman, Ph.D.; Dr. Kambiz Birashk, M.D., The Laurels; The Southwest Virginia Mental Health Institute, ("Southwest"); Johnston Memorial Hospital; and Wellmont Bristol Regional Medical Center.

On January 28, 2000, Robins was admitted to The Laurels for detoxification services. (R. at 97.) He was placed on a Librium protocol due to his long history of alcohol abuse and a corresponding increased potential for withdrawal symptoms. (R. at 97.) On January 30, 2000, Robins was treated at the Laurels, and he was

---

[3]Regionally is defined as within a 150-mile radius of the Kingsport Office of Hearings and Appeals.

[4]Light work is work which does not entail lifting items weighing more than 20 pounds occasionally and more than 10 pounds frequently. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

-7-

prescribed amitriptyline and Prozac. (R. at 99.) Robins was admitted on a Temporary Detention Order, ("TDO"), on January 31, 2000, due to suicidal ideation related to alcohol intoxication. (R. at 98.) The treatment record indicates that Robins had an alcohol level of .164 upon admission. (R. at 98.) Robins stated that he had been drinking daily since he was 20 years old and that he usually drank about two fifths of wine per day. (R. at 98.) Further, the treatment record reports that Robins focused on his depression rather than the alcohol problem and that he stated several times that he needed disability benefits. (R. at 98.) Robins was diagnosed with alcohol dependence, social phobia, hypertension, problems with his primary support group and social environment, financial issues and employment issues. (R. at 98.) Robins was discharged on January 31, 2000, and was prescribed Verapamil and Prozac. (R. at 97.)

Robins returned to The Laurels the same day and was admitted on a voluntary basis due to alcohol intoxication. (R. at 102.) His blood alcohol level was .07 upon admission. (R. at 102.) The treatment record indicates that Robins was in the program for only a couple of hours when the nurse observed him being more unresponsive and unsteady; several antidepressants were found in his bed. (R. at 102.) Robins was discharged on February 1, 2000, but was prescribed no further medication. (R. at 102.)

On February 2, 2000, Robins was admitted to The Laurels again on a TDO due to suicidal ideation related to alcohol intoxication. (R. at 103.) The treatment record indicates that Robins was given Librium, Clonidine, ibuprofen, and Benadryl for symptoms of withdrawal. (R. at 103.) Robins remained in the program throughout the TDO period and was then voluntarily committed to The Laurels for five days. (R.

at 103.) Robins remained in the program for eight days before leaving with a regular discharge; he scheduled an outpatient counseling appointment for February 14, 2000, with Mary Williams of Highlands Community Services. (R. at 103.)

Robins was again admitted into The Laurels on February 13, 2000, due to suicidal ideation related to alcohol. (R. at 108-09.) His blood alcohol level upon admission was .20. (R. at 108-09.) The treatment record notes that Robins was initially drug seeking, but once he realized it was not working, he stopped. (R. at 109.) The treatment record further reported that Robins seemed more motivated to change, and he had fully admitted his alcohol problem. (R. at 109.) The attending physician again placed Robins on the Librium protocol and prescribed him Clonidine, Tylenol, Benadryl, ibuprofen and various vitamins. (R. at 108.) Robins was discharged on February 20, 2000, but was admitted again on March 24, 2000, for suicidal ideation and an alcohol level of .24. (R. at 106-07, 109.) During this visit, Robins met with the liaison from Transitions to discuss longer term treatment after his detoxification period was over. (R. at 107.) The treatment record indicates that Robins seemed motivated to change and he was willing to stay voluntarily in the program; Robins was considering halfway house placement out of the area. (R. at 107.) He was discharged on March 28, 2000. (R. at 107.)

Robins was admitted again to The Laurels for suicide ideation on April 28, 2000; his blood alcohol level at admittance was .098. (R. at 112-13.) During this stay, Robins met with independent certifier, Kristie Burke, and was found not to meet the commitment criteria. (R. at 113.) Robins was placed on Librium protocol due to his long history of alcohol dependence and to address the previously stated

-9-

withdrawal symptoms. (R. at 113.) The treatment record indicates that Robins requested to leave as soon as the TDO expired, and he did not want to complete detoxification. (R. at 113.) The records further report that Robins was court ordered to outpatient services through Highlands Community Services and planned to attend counseling on a more regular basis. (R. at 113.) Robins was discharged on May 1, 2000, but was admitted again to The Laurels on June 25, 2000, with an alcohol level of .12. (R. at 116-17.) The treatment record reports that Robins did not complete the Librium protocol because he left the program the day after admission, and the police and Highlands Community Services staff were notified. (R. at 116-17.)

Robins was again admitted to The Laurels on August 12, 2000, with a blood alcohol content of .15 on admission. (R. at 122-23.) The record indicates that Robins left the program the day after admission; the police and Highlands staff were notified. (R. at 123.) Robins was returned to The Laurels by the Sheriff's Department on August 16, 2000. (R. at 120.) By then, the TDO had expired. (R. at 120.) The record notes that, against medical advice, Robins stayed only for a few minutes before he signed himself out. (R. at 120.) The record further notes that he did not appear willing or motivated to make any lifestyle changes necessary to achieve sobriety, and he refused an aftercare appointment. (R. at 120.)

Robins returned voluntarily to The Laurels for the eighth time on October 21, 2000, and he reported drinking several pints of liquor that day. (R. at 126.) He received Librium for withdrawal symptoms but only remained in the program several hours before he signed himself out against medical advice. (R. at 126.) Robins then declined an outpatient counseling appointment because he stated that he already had one. (R. at 126.)

-10-

Robins was admitted on a TDO due to suicidal ideation related to blood alcohol intoxication on January 5, 2001, with a blood alcohol level of .17. (R. at 128-29.) Robins stated that he drank a 12-pack of beer before admission. (R. at 129.) Robins was again given Librium for the withdrawal symptoms, but on January 8, 2001, Robins left the program against medical advice after his TDO expired. (R. at 129.) Robins returned to The Laurels again on August 27, 2001, with an alcohol level of .14 upon admission. (R. at 132-33.) The record noted that he appeared agitated upon admission, but that he had no suicidal ideations. (R. at 133.) He remained in the program for only two days before he was Absent Without Leave, ("AWOL"). (R. at 133.)

On December 30, 2001, Robins was admitted to the Southwest, pursuant to a TDO. (R. at 134.) The discharge summary indicates that Robins had presented himself to the jail earlier in the evening and requested that he be hospitalized. (R. at 135.) Robins complained of depression and an inability to cope with life. (R. at 135.) Robins said that he had not experienced suicidal ideations during the previous six months. (R. at 135.) The jail staff placed a call to Southwest, but the hospital denied him admission because there was no acute need and the hospital believed that he was malingering. (R. at 135.) Following Southwest's denial of his admission, Robins went home and took an overdose of his medication. (R. at 135.) Robins immediately called an ambulance, and upon his arrival in the emergency room, Robins said that he "guessed the hospital would have to take him now." (R. at 135.) Robins stated that he had taken 10 to 15 of his prescription medications because he had gotten real depressed over not getting disability benefits. (R. at 134.) In the discharge summary, it indicated that Robins stated that he was currently sober except for prescribed medications, which included Celexa, Clonidine and Tranxene. (R. at 134.) The

-11-

record indicated that he has been on Tranxene, but it was hard to understand if he had been taking them lately. (R. at 134.) It also reported that Robins said that his only hope was to get on disability in order for him to have some form of income because he was unable to work due to anxiety, panic attacks and nerve problems. (R. at 134.) The record also indicated that the prescreener who saw Robins for hospitalization said that the patient had presented himself to the jail earlier in the evening and he requested hospitalization for depression and complained of an inability to cope with life. (R. at 135.) He stated that he thought about shooting himself, but denied any intentions of actually performing the act. (R. at 135.) Ridgeview and Southwest were contacted, but both denied admission because there was no acute need. (R. at 135.) The hospitals believed that Robins was "merely malingering." (R. at 135.)

While at Southwest, on January 10, 2002, a mental status exam demonstrated that Robins had impulse control and behavior problems, depression, poor appetite and a sleep onset problem. (R. at 135.) The record indicates that Robins was extremely manipulative when he wanted to go to the hospital, and that he would state and do whatever was necessary to achieve this goal. (R. at 135.) The prescreener deemed that because of his suicidal ideation and lack of impulse control, Robins was appropriate for a TDO. (R. at 135.) Robins was diagnosed with a major depressive disorder, alcohol dependence in partial remission, hypertension treated with Clonidine and that Robins had no income, had not worked, did not have any relationship or girlfriend and his disability had been denied. (R. at 138.) Robins was discharged because he did not meet the commitment criteria; he was given a 10-day supply of medications and a 20-day supply of medication was given to Terry Stone that consisted of Celexa, Clonidine and Trazodone. (R. at 139.)

On April 29, 2002, Robins went to Johnston Memorial Hospital complaining

of anxiety; he stated that he had stopped drinking three months ago, but he felt so nervous that day that he drank a 12-pack of beer. (R. at 143.) The attending physician gave his clinical impression as anxiety and acute ethyl alcohol intoxication. (R. at 144.) Robins was treated with Thorazine and Tenormin. (R. at 142.) On May 30, 2002, Robins returned to Johnston Memorial and complained of his legs shaking, and stated that he felt like he was dying. (R. at 140.) He was told to wait to see a doctor after his triage assessment, but he left shortly thereafter stating that he was going outside to smoke. (R. at 141.) However, he signed out against medical advice and the Sheriff's office was called to alert them of Robins's condition. (R. at 141.)

On June 5, 2002, Robins returned to The Laurels where he was treated for alcohol withdrawal symptoms with Librium, Clonidine and Benadryl. (R. at 148.) He was discharged the next day against medical advice with diagnoses of alcohol dependence, personality disorder, hypertension and problems with his social environment. (R. at 148-49.) The attending physician recommended that Robins attend Alcoholics Anonymous and seek a long-term therapeutic environment. (R. at 149.) Robins returned to the emergency room at Johnston Memorial on June 8, 2002, and complained of depression and that he did not feel well. (R. at 154.) He denied any suicidal ideations, and he was diagnosed with ethyl alcohol intoxication and released into the care of this father with whom he lived. (R. at 154.) On June 8, 2002, Robins went to the Johnston Memorial emergency room and complained that he was not feeling well and just wanted to be checked out. (R. at 155.) Later, on June 11, 2002, Robins returned to Johnston Memorial emergency room and complained of depression and stated that he "wanted a hole in his head." (R. at 152.) The attending physician complained that Robins abused the system because he had just left The Laurels two days earlier with multiple admissions. (R. at 152.) Robins was diagnosed with chronic alcohol abuse and depression. (R. at 152.) Evelyn Hamilton

from Highlands Community Services instructed the attending physician to send Robins to jail and that she would evaluate him there; the police then transported Robins to jail. (R. at 153.)

On June 23, 2002, Robins was again admitted to Southwest. (R. at 161.) The record indicated that Robins contacted central dispatch and stated that they needed to send over an ambulance because he was going to shoot himself. (R. at 161.) When the officers arrived, Robins was sitting on his front porch with a loaded .22 caliber rifle, and he had consumed a pint of liquor and a 12-pack of beer during the day. (R. at 161.) He stated that he had not drunk in two weeks, but then admitted to being arrested twice during the week for public intoxication. (R. at 161.) Robins told the prescreener that he drank because he was having trouble holding a job and felt badly about having to live with his father all his life. (R. at 161.) He further stated that he had no suicidal ideation, and that he just wanted help. (R. at 161.) Robins was diagnosed with alcohol dependence, depressive disorder, anxiety disorder and hypertension. (R. at 162.) Upon discharge, Robins denied any suicidal ideation or feelings of depression; he was prescribed multivitamins, Thiamine and Clonidine. (R. at 162.) Robins returned to Johnston Memorial emergency room on June 25, 2002, but left before being seen by the doctor. (R. at 183.) Robins returned again to Johnston Memorial emergency room on July 28, 2002, and complained about his stomach swelling. (R. at 175.) The physician found that the abdomen was normal, but he had a chronic alcohol abuse problem. (R. at 175, 177.)

On August 11, 2002, Robins returned to Johnston Memorial emergency room because of abdominal pain but refused lab work. (R. at 171.) On August 15, 2002, Robins again returned to Johnston Memorial emergency room because of abdominal pain and was transferred to The Laurels where he was given Clonidine and Librium.

-14-

(R. at 164,184.) Against medical advice he signed himself out the next day. (R. at 184.) On August 23, 2002, Robins was taken to the emergency room at Johnston Memorial because of a suicide attempt in which he took 22 Celexa and drank 15 beers. (R. at 260.) Robins signed himself out against medical advice before being seen by the attending physician. (R. at 260-61.) Robins was again escorted to Johnston Memorial on August 29, 2002, for a reported overdose of acetaminophen, Celexa and a 12-pack of beer. (R. at 253.) However, Robins denied any suicidal thoughts. (R. at 255.) He was diagnosed with depression and ethyl alcohol intoxication, and the police escorted him home. (R. at 255.) On September 7, 2002, Robins returned to the emergency room because of tenderness in his abdomen. (R. at 248.)

On October 8, 2002, Robins visited the Crossroads Medical Mission and complained of nervousness, depression and difficulty with communication. (R. at 277.) He was diagnosed with anxiety, social phobia, insomnia and hypertension. (R. at 277.) On October 15, 2002, Robins returned stating that his blood pressure increased because of the medications. (R. at 276.) He was prescribed Celexa, Klonopin, Elavil and amitriptyline. (R. at 276.)

On October 27, 2002, Robins returned to Southwest after he drank an undetermined amount of alcohol because he was dealing with the death of his grandfather and he also had an argument with his father. (R. at 282.) Robins further stated that he felt frustrated for not being able to get disability benefits. (R. at 282.) Robins admitted that he had suicidal tendencies; however, after sobering, he denied any suicidal ideations. (R. at 282.) Robins was diagnosed with alcohol dependence, alcohol-induced mood disorder, personality disorder, hypertension and financial and environmental stressors. (R. at 284.) Robins was given the Librium protocol and was

restarted on Celexa. (R. at 284.) Robins said that he was agreeable with continuing outpatient treatment, but he was unwilling to stay in the hospital for any type of residual program. (R. at 284.) Robins was evaluated, but he did not meet the specific inpatient involuntary commitment criteria so his petition was dismissed by order of the court. (R. at 284.)

On October 30, 2002, Robins again visited Southwest with his primary complaint being that he was drinking again and felt depressed. (R. at 286.) Even though Robins spoke of alcohol dependence and social stressors, he focused more on his financial needs. (R. at 286.) Robins denied any thoughts of suicide, but acknowledged making statements to the contrary. (R. at 289.) The record indicated that Robins had refused alcohol rehabilitation interventions or inpatient treatment and that he was noncompliant with medical regimens. (R. at 286.) He was diagnosed with alcohol dependence and alcohol-induced mood disorder, adjustment disorder, personality disorder, hypertension and financial stressors. (R. at 289-90). Because of the behavior identified and the potential for immediate relapse regarding alcohol abuse and associated suicidal behavior when Robins was intoxicated, he was recommended for involuntary commitment. (R. at 289.) However, he did not meet the criteria for involuntary commitment, and he refused voluntary inpatient hospitalization. (R. at 289.) Robins agreed to continue with outpatient follow-up treatment and to go to Alcoholics Anonymous meetings. (R. at 289.) He was prescribed Celexa and Clonidine and then discharged. (R. at 290.)

On November 12, 2002, Crossroads Medical Mission reported that Robins was feeling much better and that the Klonopin and Celexa seemed to be helping him. (R. at 275.) They also stated that Robins was taking better care of himself by walking and eating better. (R. at 275.) Robins was referred to Community Health Center,

("CHC"). However, on November 14, 2002, Robins returned to Southwest, and the records indicate that his chief complaint was his frustration with not being able to get disability benefits. (R. at 291.) The combined psychiatric evaluation and discharge summary reports that Robins was readmitted with recurrent problems of alcohol abuse, as well as personality disorder and dysfunctional behavior involving threats to harm himself, which were related to his frustration associated with disability issues. (R. at 293.) Robins was continued on Celexa during his hospitalization and was offered the opportunity to voluntarily continue his hospitalization, but he again declined. (R. at 294.) However, the report also indicated that he usually was agreeable to the idea of continuing outpatient intensive services when discharged previously, but he had continued to demonstrate the behavior of primarily accessing emergency services with attempts to reenter inpatient care. (R. at 294.) Robins was diagnosed with an adjustment disorder, alcohol dependence, a personality disorder, hypertension and environmental stressors. (R. at 294.) Robins did not meet the criteria for involuntary commitment, and he was discharged on November 15, 2002, with prescriptions for Celexa, Clonidine and Klonopin. (R. at 294.)

That same day, Robins was taken to the emergency room at Johnston Memorial for an intentional drug overdose. (R. at 242.) The record indicated that he had been drinking and took approximately 12 Celexa pills. (R. at 241.) The attending physician stated that Celexa in that amount should not be significant and that the mental health department cleared the patient, so he was sent home. (R. at 243.) Four days later on November 19, 2005, Robins was again rushed to the emergency room due to a drug overdose of two Klonopin, two Clonidine and 14 Paxil. (R. at 232.) At the emergency room, Robins refused to have blood work done and denied alcohol intoxication even though the attending physician diagnosed Robins with alcohol abuse. (R. at 232-34.) He was discharged as soon as he was deemed stable and had

been cleared by the mental health department. (R. at 232-34.) The same day, Robins went to Crossroads Medical Mission where he stated that he needed to talk to a doctor about his medications. (R. at 274.) During the visit, Robins denied any suicidal intentions and was prescribed Paxil for his depression. (R. at 274.) The physician again instructed him to follow up with CHC. (R. at 274.)

On November 21, 2002, Robins was again escorted to Johnston Memorial emergency room for another suicide attempt with Klonopin, Clonidine and ethyl alcohol. (R. at 299.) When Robins was admitted into Johnston Memorial Hospital, his ethyl blood alcohol level was .2798. (R. at 301.) On November 22, 2002, Johnston Memorial reported that Robins was doing fine and that he was attending substance abuse meetings and was going to Alcoholics Anonymous three times a week. (R. at 298.) He was diagnosed with acute alcohol intoxication, which was resolved, and the record noted that he was not suicidal. (R. at 298.)

On December 12, 2002, Robins again visited Johnston Memorial emergency room where he was crying and stated that he was depressed and wanted to die, but he was more afraid to die than to live. (R. at 226.) He was diagnosed as depressed and sent home after becoming stable. (R. at 228.) He had a similar visit to Johnston Memorial again on December 29, 2002, except this time he admitted that he had started drinking again. (R. at 222.) He stated that he needed help because he could not afford to buy his psychiatric medications. (R. at 222.) He was then diagnosed with a major depressive disorder and transferred to the Southwest. (R. at 222.)

Southwest's record indicates that Robins was brought to Johnston Memorial after he called the Community Services Board crisis line with the desire for detoxification and threats of suicide if he did not get treatment. (R. at 308). This was

the tenth hospitalization at Southwest for detoxifcation. (R. at 308.) He had a blood alcohol level of .185 and a urine drug screen that was positive for benzodiazepines. (R. at 308.) The record indicated that Robins believed that he could not work due to alcohol and depressive symptoms and wanted disability benefits. (R. at 309.) Robins quoted a panic attack history, but the symptoms merely sounded like withdrawal. (R. at 309.) It was also noted that Robins did nothing to help himself and went on to explain that when Robins first arrived he was intoxicated and had suicidal ideation, so he was placed on suicide precautions with one-on-one observation. (R. at 309-12.) The next day, he denied any suicidal intentions, so suicidal precautions were discontinued, but he admitted depression and tried to rationalize his depression, while minimizing the primary role of alcohol in his depression etiology. (R. at 313.) Robins made no threats, got along well with others, and had no panic attacks, crying episodes or seizures while he was hospitalized. (R. at 313.) The attending physician discontinued Robins's use of Klonopin due to his recurring alcohol relapses. (R. at 313.) During his stay, Robins suggested to the treatment team that he wanted to get on disability because of his alcohol problems and depression; the treatment team recommended that he not do that because idleness could cause him to use alcohol again. (R. at 313.) Robins stayed only one day at Southwest and was then court-ordered to be discharged. (R. at 314.) While at Southwest, he was diagnosed as having an alcohol-induced mood disorder with depressed features and a personality disorder; he was prescribed Celexa and Clonidine. (R. at 312-14.) Robins's condition upon discharge was recorded to be improved, but not recovered; he was instructed to seek an Alcoholics Anonymous sponsor and to keep track of his follow-up counseling appointments. (R. at 317.)

Robins was admitted again to Johnston Memorial emergency room on January 12, 2003. (R. at 209.) His main complaint was that he took approximately 20 Celexa

tablets and some Klonopin at noon. (R. at 209.) The attending physician reported that Robins was agitated and kept alternating between wanting to commit suicide and then denying suicidal intentions. (R. at 209.) His blood alcohol level was 202 mg/dl, and his drug test screens were all negative. (R. at 209.) The attending physician gave an impression that Robins suffered from substance abuse with alcohol addiction, suicidal ideation and apparent personality disorder. (R. at 209.) The next day, Robins was released home with instructions to follow up with his case manager, and no medications were prescribed. (R. at 209.)

On March 2, 2003, Robins was again admitted to Southwest. (R. at 318.) The record indicates that his chief complaint was that he was drinking, and he still wanted disability benefits. (R. at 318.) During this episode, Robins made threatening suicidal statements to an emergency services officer with a threat of "blowing [his] head off." (R. at 318.) Robins was admitted for stabilization of recent behavioral adjustment difficulties, occurring in the setting of alcohol dependence and a component of alcohol-induced mood disorder. (R. at 321.) The record also noted that Robins had been preoccupied for some time in regards to obtaining disability benefits and utilized entry into the hospital as his vehicle to obtain disability benefits. (R. at 321.) Furthermore, the record indicates that Robins was agreeable with continuing his medication and in attempting to discontinue his alcohol abuse and that he demonstrated significant improvement during his stay on the unit with no recurrent suicidal ideation. (R. at 321.) Upon discharge, Robins was diagnosed with alcohol dependence, an alcohol-induced mood disorder, a personality disorder, hypertension and financial stressors. (R. at 321-22.) Further, Robins was described as being improved but not recovered, and he was prescribed Prozac and Clonidine. (R. at 322.) It was also recommended that he continued outpatient alcohol dependence treatment and participate in Alcoholic Anonymous. (R. at 322.)

On March 21, 2003, Robins returned to Johnston Memorial complaining that his legs were shaking. (R. at 203.) He stated he felt nervous and he could not take it anymore, so he started drinking and took some Valium. (R. at 203.) The attending physician stated that he demanded to know what caused Robins's attacks and then pointed out to Robins that he was not compliant with any treatment or medication and he regularly visited the emergency room and then disappeared. (R. at 204.) He was diagnosed with depression and sent home. (R. at 205.) Robins returned to Crossroads Medical Mission on March 25, 2003, to refill his medications because of an alleged panic attack. (R. at 273.) The attending physician refilled his Prozac and Clonidine and prescribed him Xanax and told him to stop taking Klonopin. (R. at 273.)

On April 5, 2003, Robins returned to Johnston Memorial emergency room because he felt like he was dying and he was shaking all over. (R. at 200.) He stated that he needed his medication but he could not afford them. (R. at 200.) On April 29, 2003, Robins returned again to Johnston Memorial emergency room and complained of bright red stool, which he stated that he had been experiencing for the past two to three years, and he complained of coughing up bright red blood. (R. at 198.) However, Robins did not answer when called to see the attending physician. (R. at 199.)

On June 14, 2003, Robins returned to Johnston Memorial emergency room again and complained of leg pain that had been persistent for the past two years. (R. at 194.) He was prescribed Vioxx and was diagnosed with chronic leg pain. (R. at 196.) On July 22, 2003, Robins went to Crossroads Medical Mission and complained of increased blood pressure, depression and stated that he needed more Prozac. (R. at 272.) The attending physician prescribed Clonidine, Prozac and recommended

CHC. (R. at 272.) The physician commented that at least Robins was not asking for Xanax or Klonopin. (R. at 272.)

On August 31, 2003, Robins was admitted to the emergency room at Johnston Memorial complaining of a toothache. (R. at 190-93.) Robins was diagnosed with dental pain and instructed to follow up at the dental clinic. (R. at 193.) On September 2, 2003, Robins returned to Johnston Memorial for treatment of his toothache. (R. at 186-89.) The attending nurse noted that Robins had visited the emergency room several times that week, but that he refused to open his mouth for an exam, telling the nurse that "you don't know what you are doing anyway." (R. at 187.) When the nurse refused to provide him with narcotic pain medication, Robins got up and walked out. (R. at 188.) Robins was diagnosed as drug-seeking, and the attending physician told Robins to visit a dentist. (R. at 188.) The physician also noted that Robins consistently asked for pain medication and Robins had been threatening to the nursing staff. (R. at 188.) Robins left after he could not get pain medication and no prescriptions were given. (R. at 188.) On September 16, 2003, Robins visited Crossroads Medical Mission and complained of the same toothache and the attending physician prescribed him Amoxil and hydrocodone. (R. at 271.) Robins wanted more hydrocodone, but the attending physician did not prescribe it. (R. at 271.)

On September 29, 2003, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment on Robins. (R. at 333-36). In her report Hamilton found that Robins was moderately limited in his ability to understanding, remembering, and carrying out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to complete a normal

workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 333-35.) He was not significantly limited in all remaining categories. (R. at 333-35.) Hamilton remarked that Robins was limited in his ability to sustain concentration, persistence and pace and that his personality limited his ability to interact socially, but it did not preclude any work. (R. at 335.) Hamilton noted that given alcohol abstinence, Robins could be capable of performing simple, unskilled and non-stressful competitive work. (R. at 335.) On the same day, Hamilton completed a Psychiatric Review Technique form ("PRTF"), on Robins. (R. at 337-50.) On the PRTF, Hamilton recognized that Robins suffered from depression, borderline intellectual functioning, anxiety, a personality disorder and ethyl alcohol dependence. (R. at 340-45.) Hamilton reported that Robins had moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and that Robins experienced one or two repeated episodes of decompensation. (R. at 347.) Hamilton also remarked that Robins's condition was severe, due to noncompliance with multiple treatment recommendations following multiple detoxification hospitalizations and due to chronic ethyl alcohol dependence. (R. at 349.) She reported that Robins was not taking actions to improve his mental condition due to his denial of alcohol dependence and abuse and his personality factors. (R. at 349.) However, Hamilton indicated that with alcohol abstinence Robins could be capable of simple, unskilled competitive work. (R. at 349.) Hamilton's opinions on the assessment and PRTF were reviewed and affirmed by

-23-

Hugh Tenison, Ph.D., and another state agency psychologist, on November 24, 2003. (R. at 335, 337.)

Throughout the month of October 2003, Robins was seen three times at the Crossroads Medical Mission to alter and request medication prescriptions. (R. at 268-70.) He stated that he believed Prozac worked the best for his depression. (R. at 269.) Each report noted that Robins had yet to be seen at the counseling center. (R. at 268-70.)

On January 30, 2004, Robins visited Wellmont Bristol Regional Medical Center, ("BRMC"), with a complaint of depression and panic attacks because he could not work. (R. at 354.) The attending physician reported that Robins had depression, probably a learning disability and borderline mental retardation. (R. at 354.) Robins was diagnosed with a depressive disorder, a panic disorder, a social anxiety disorder, possible borderline intellectual functioning, hypertension and gastroesophageal reflux disease. (R. at 352.) Robins was admitted at the Ridgeview Pavilion and he was given Prozac, Catapres and Inderal; he was placed on suicidal precautions and AWOL precautions. (R. at 356.) Upon discharge on February 2, 2004, the attending physician indicated that Robins reported that he was not having any suicidal thoughts, but that he wanted help because he could not work. (R. at 352.) Robins also reported that he could not go in a crowd and could not participate in some of the processes of being employed, and he was attempting to find help; he further said that this was why he reported that he was suicidal. (R. at 352.) The physician reported that Robins seemed to be functioning and coping better and was sleeping and eating better as well. (R. at 352.) Robins was discharged to his home and encouraged to continue to follow-up at Highland's Mental Health Center; he was given prescriptions of Prozac, Inderal, Catapres and hydrochlorothiazide. (R. at 352-53.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4ᵗʰ Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4ᵗʰ Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4ᵗʰ Cir. 1980).

By decision dated March 26, 2004, the ALJ denied Robins's claims. (R. at 16-21.) The ALJ found that Robins met the disability insured status requirements of the Act and was insured for DIB purposes through the date of the decision. (R. At 20.) The ALJ concluded that Robins had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 20.) The ALJ found that Robins suffered from

severe impairments, borderline intellect and from alcohol abuse, but the ALJ found that his impairments did not meet or medically equal one of the listed impairments found at 20 C.F.R. Part 404, Subpart P. (R. at 20.)  The ALJ believed that Robins's allegations regarding his limitations were not totally credible and that he retained the residual functional capacity to perform all work except those jobs requiring him to perform highly skilled and complex tasks and jobs that required interaction with the public. (R. at 20.)  The ALJ found that Robins could not perform his past relevant work. (R. at 20.)  Based on Robins's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy which Robins could perform.  Therefore, the ALJ concluded that Robins was not under a "disability" as defined in the Act at any time through the date of the decision. (R. at 20.)  *See* 20 C.F.R. §§ 404.1520(g) and 416.920(g) (2005).

Robins argues that the ALJ's decision is not supported by substantial evidence. Specifically, Robins argues that the ALJ has an absolute duty to ask the vocational expert, on the record, if his testimony was consistent with the Dictionary of Occupational Titles, and by not doing so, the ALJ violated Social Security Ruling 00-4p.  (Memorandum In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 7.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings and whether the findings were reached through application of the correct legal standards. *See Coffman,* 829 F.2d at 577.

At the hearing, Spangler, the vocational expert, testified that an individual like Robins, with the residual functional capacity for simple unskilled work not requiring

regular interaction with the general public could perform the job of janitor at either the medium or light exertional level. (R. at 386.) Under the Dictionary of Occupational Titles, ("DOT"), however, janitor is only listed as medium exertion, not light and janitor is listed as a semiskilled job. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES, janitor, occupational code 382.664-010 (4th ed. rev. 1991). Therefore, Robins is correct in his assertion that there is a discrepancy between the vocational expert's testimony and the DOT.

Social Security Ruling, ("S.S.R.") 00-4p requires the ALJ resolve any conflicts that might exist between the vocational expert testimony and the DOT. Specifically, under S.S.R. 00-4p,

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator *must elicit* a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearing level, as a part of the adjudicator's duty to *fully develop* the record, the adjucator will inquire, on the record, as to whether or not there is such consistency.

S.S.R. 00-4p, WEST'S SOCIAL SECURITY REPORTING SERVICE, (West Supp. 2005) (emphasis added). The Fourth Circuit has held that the ALJ's reliance on a vocational expert's testimony based on an outdated edition of the DOT required a remand. *See English v. Shalala,* 10 F.3d 1080, 1083 (4th Cir. 1993).

At the hearing, the ALJ found that Robins was limited to simple, unskilled jobs that would not require regular interaction with the general public. (R. at 386.) Then

the ALJ asked Spangler, the vocational expert, what level of jobs Robins could perform with the residual functioning capacity of simple, unskilled, with no interaction with the public. (R. at 386.) Spangler testified that Robins could perform jobs in the "[j]anitoral [category] [that] is both medium and light. And, janitorial at the medium [level] [there] [are] 8,100 [jobs] in the region, so that is the single biggest category [of] job[s]." (R. at 386.) This was the only job classification which Spangler testified about regarding actual specific numbers in the national economy. However, the job of janitor is not unskilled but rather it is semiskilled because it has a specific vocational preparation, ("SVP"), of three. *See* DICTIONARY OF OCCUPATIONAL TITLES, janitor, occupational code 382.664-010 (4th ed. rev. 1991). Jobs with an SVP of three are semiskilled jobs, not unskilled. *See* 20 C.F.R. §§ 404.1568, 416.968 (2005).

Therefore, an obvious conflict exists between the vocational expert testimony and the DOT, which the ALJ did not inquire about, and by not doing so, the ALJ violated S.S.R. 00-4p, which imposes an affirmative duty, by its clear, unambiguous language that the ALJ is to resolve any conflicts between the vocational expert testimony and the Dictionary of Occupational Titles. *See Oxendine v. Massanari*, 181 F. Supp. 2d 570, 574 (E.D.N.C. 2001). Thus, the ALJ failed at step five to prove that a significant number of jobs exist in the national economy which Robins could perform by relying on erroneous vocational expert testimony. Furthermore, this error by the ALJ was exponentially compounded by the fact that Robins was representing himself pro se at the hearing. *See Crider v. Harris,* 624 F.2d 15, 16 (4th Cir. 1980), (where the court stated it is the "ALJ's duty to provide sympathetic assistance to the pro se plaintiff in developing the record"). Therefore, I will remand Robins's claims to the Commissioner.

*IV. Conclusion*

Based on the above, the plaintiff's and defendant's motions for summary judgment will be overruled and plaintiff's motion for remand will be sustained. Plaintiff's claims for benefits will be remanded to the Commissioner for further consideration in accordance with this memorandum opinion. The Commissioner's decision denying benefits will be vacated, and

An appropriate order will be entered.

DATED:   This /st day of November, 2005.

_____
Senior United States District Judge